## PACE CORPORATION, Kemper Insurance Company Insurance Carrier v. Joyce BURNS

5-5633                                    472 S.W. 2d 78

Opinion delivered November 1, 1971

*Gaughan, Laney, Barnes, Roberts & Harrell,* for appellants.

*Woodward & Kinard,* for appellee.

J. Fred Jones, Justice. This is a workmen's compensation case in which the appellee, Joyce Burns, claimed compensation benefits because of an injury to two discs in her cervical spine which occurred when some boxes fell on her while in the course of her employment by the appellant, Pace Corporation, during the first part of March, 1969. Compensation was awarded by the Commission and the award was affirmed on appeal to the Ouachita County Circuit Court. On appeal to this court Pace Corporation and its compensation insurance carrier rely on the following point for reversal:

"There is not substantial evidence in the record to support the workmen's compensation Commission's

finding that the claimant's disability was caused by an on-the-job accident.''

Mrs. Burns testified that she is 37 years of age and started working for the Pace Corporation in August, 1968. She testified that sometime during the first two weeks in March, 1969, she was engaged in her regular duties of sitting at a powder machine and "putting powder in cases." She testified that after filling the cases she would put them in wooden boxes which weighed three or four pounds each and would then start the boxes, containing the cases, along a conveyor belt which moved along an assembly line. She says that the empty boxes she was using were stacked behind where she sat at the powder machine; that on the day of her injury the boxes were piled high behind her and that as she reached to get one of the cases to put powder in, the pile of boxes fell on her. She says that a knot was raised on the back of her head where it was struck by one of the boxes, and that she had a terrific headache immediately following the boxes falling on her. She says that she went to the office and the office secretary, Mrs. Crawford, gave her two white tablets, which could have been aspirin. She says she does not recall having received any medication prior to the incident, but that she received aspirin from Mrs. Crawford for headache quite often following the injury and that she suffered headaches up until the time of her surgery. She testified that after obtaining aspirin for her headache on the day of her accident, she returned to work and worked until around the 9th of April when she experienced severe pain in her arm and went to a doctor. She then testified as follows:

"Q. What doctor did you go to?

A. Doctor Hout.

Q. What complaint, if any, did you make to him with regard to your head?

A. Well, now I didn't make any statement to him because I didn't think it was my head. When I went to him for this it was my arm, it was

bothering me in my arm. I couldn't raise my arm and I'd just holler everytime I'd get up.

Q. How long had this been going on?

A. Well, it started about the 9th of April or the 10th of April, somewhere thereabout.

\* \* \*

Q. And you worked then until April the 9th?

A. That's right.

Q. Why did you terminate on April the 9th?

A. I got up out of bed and I walked just about a foot from the bed and I couldn't move my arm. It was hurting me and I got to hollering and my husband asked me what was wrong and I told him something had gone wrong with my arm because I had this terrible pain and a headache.

Q. What did you do after that?

A. Well, he took me to Doctor Hout.

Q. Did Doctor Hout treat you?

A. Doctor Hout gave me a shot and told me it was bursitis and gave me a shot and sent me home.

Q. What type of examination did Doctor Hout perform?

A. Well, he just looked around and felt around, to the best of my knowledge, of my arm.

Q. What statements, if any, did you make to Doctor Hout with regard to the boxes?

A. I did not, I could not remember. I did not remember at that time about them. I never thought that would be caused from anything."

Mrs. Burns testified that she was seen by Dr. Hout four times and that each time he gave her a shot for bursitis. She stated that the shots gave her no relief from the pain in her arm so she then went to Dr. Meek. She says that Dr. Meek put her in the hospital for a week for bursitis; that her condition continued to get worse rather than better; that Dr. Meek advised her that something was wrong other than bursitis and recommended that she go to the Warner Brown Hospital in El Dorado for an examination by Dr. Hartmann. She says that a myelogram was performed by Dr. Hartmann, whereupon he advised her that some "discs were out of place" and that surgery would have to be performed. She testified that Dr. Hartmann then performed an operation on her neck for the removal of discs, and that following the surgery Dr. Hartmann fitted her with a cervical collar with instructions to wear it as long as she had muscle spasm. She says she is still under Dr. Hartmann's care and was seen by him on the Monday prior to the hearing. She testified that prior to her injury she was in pretty good shape physically; that she had no headaches and had never had a previous injury. Mrs. Burns then testified as follows:

"Q. Now, do you recall if you ever discussed this box falling incident with any physician?

A. The only one I discussed it with when I really remembered and thought about it was Doctor Hartmann.

Q. When was that? Do you recall?

A. No, sir, I'm sorry I don't.

Q. How did you recall that at that time, do you remember?

A. I just remembered out of the clear blue sky. I just thought about it. They were asking me

about car wrecks, if I ever had been in a car wreck or anything and I just happened to think. He said any accident and that made me think of the boxes falling on me.

Q. Had you discussed this with Doctor Hout?

A. No, sir, I had not.

Q. Had you discussed this with Doctor Meek?

A. No, sir, I had not because I did not remember it then."

Mrs. Burns testified that other than the headaches, all of her symptoms came on suddenly when she got up from bed on the morning of April 9th or April 10th and experienced severe pain in her arm. She testified that she does not remember whether she gave Dr. Hout any history or not. She says she has taken so much medicine that she has been unable to remember very much. As to Dr. Meek, she testified as follows:

"A. I remember talking to Doctor Meek and I remember Doctor Meek asking me if there was an accident at that time but I could not remember because I was having one shot right after another one and I just can't remember things when I'm like that.

Q. Do I understand then that you do remember Doctor Meek asking you about an accident and you told him no or that you didn't remember having one because you didn't. . .

A. I told him not as I knew of. I didn't know.

Q. But again you do remember him questioning you?

A. I do after I got off the medicine. I can remember the report but I couldn't as long as I was having those shots every so many hours.

Q. I don't quite understand. Did you actually, prior to talking to Doctor Meek had it occurred to you in your own mind that the box falling accident might have been responsible for this?

A. No, sir, because I could not remember it. He kept asking me if I had been in a car wreck but I could not remember anything.

Q. When did you, in your own mind, first feel like that the boxes falling might have had something to do with the condition that you had?

A. After I had had surgery and didn't have those shots but I had just taken shots and shots. About every four hours I had to have a shot for pain. I was in that much pain.

Q. In what manner did you first make the connection between the falling of boxes and having had this operation? Were you trying to think of what possibly could have caused it?

A. Doctor Hartmann asked me if I had been in a car wreck or in any kind of accident and that's when I thought about the boxes falling.

Q. Was this after you were released from the hospital and when you went back to see him in his office?

A. I really don't know. I can't remember."

Mrs. Burns' testimony about the boxes falling and one striking her on the back of her head is sustained by the testimony of Leslie Clawson, Rachel Offutt, and other fellow employees who remembered the incident of the boxes falling.

George Edward Rhodes testified that he was employed where Mrs. Burns worked in March, 1969. He says that he was walking through the plant and passed

Mrs. Burns' station and that she was sitting and rubbing her head. He testified that she looked like she felt bad and that upon inquiry she told him that some boxes had fallen on her head striking her on the back of the head. He testified that he lived in the same apartment building with Mr. and Mrs. Burns and that Mrs. Burns complained considerably about having headaches after the boxes fell on her. He stated that the most of the complaints he heard from her were while they were at home and where they drink coffee together at work.

Ethlyn Crawford testified that she was secretary in the office of the plant manager during March, 1969, and that it was customary procedure for injuries among employees to be reported to her; that she kept aspirin in her office available to anyone who wanted them, but that all complaints of injury or other complaints of illness were referred to the company nurse. She testified that the first she knew of Mrs. Burns' injury was when she was interviewed in connection with the compensation claim. She says that the only accident or illness that she recalls being reported to her by Mrs. Burns was one time when she had the flu and one time when she had an injury to her hand while working the "flaring machine." She testified that she reported all accidents to "entry and credit" and that she so reported the hand accident. She testified that Mrs. Burns obtained aspirin tablets quite often in her office when complaining of sinus headaches. She testified that from the time Mrs. Burns was first employed at the plant she came in periodically for aspirin for headaches and that she does not recall her ever coming in for aspirin when she had a knot on her head.

Richie Burns, the husband of Joyce Burns, testified that Mrs. Burns met him at the Arkansas Cafe about four o'clock in the afternoon (he does not recall the date) and he observed a knot on the back of her head. He testified that she complained of headaches and continued to take aspirin until she went to the doctor sometime in April when her arm got to bothering her. He testified that with the exception of the flu, Mrs. Burns seemed to be in good health prior to the accident. On cross-

examination he testified that to the best of his memory the lump on the back of Mrs. Burns' head and her complaint with headaches were somewhere about the first week in March. He testified that they both worked during the daytime and most of her complaints to him were at night.

No medical testimony was taken in this case and the medical evidence consists of hospital records and unverified medical reports submitted in evidence by stipulation. Record sheets from the Ouachita Hospital were introduced into evidence. The admission sheet is illegible but the summary sheet showed admission date as April 14, 1969, to April 20, 1969, with attending physician, Dr. T. J. Meek.

The pertinent information shown on the personal history sheet dated April 15, 1969, is as follows:

"Chief Complaint: Extreme pain in right shoulder, also right subscapula area.

Working Diagnosis: Acute bursitis, right shoulder.

Present Illness: The patient has had several major operations several years ago. Recently, she has been working in one of the plants across the river. She developed extreme pain in the right shoulder one week ago. She has been treated for a week by another physician in his office with injections, medications. She states the pain has not improved at all, in fact she says it has become worse. The pain is over the doltoid area and also over the subscapula area. It is exaggerated by any movement of the shoulder. She seems to be worse today. She is admitted to the hospital for treatment."

The discharge summary on this report is as follows:

"The patient admitted 4-14-69 complaining of extreme pain in the right shoulder. She was believed to have bursitis although x-ray was normal. She has been treated by another doctor for approximately

a week. She has not improved at all. During her hospital stay here she was treated with steroids injected into the shoulder. Also Indocin, Sterazolidin, sedation, Ultrasonic. In spite of all this treatment she stated the pain was not improved at all. By 4-20-69 there was still marked limitation of motion and tenderness. She may possibly have some involvement of the nerve being impended upon from the cervical spine. She is discharged today and referred to the care of Dr. Earnest Hartmann in El Dorado."

The summary sheet dated April 20, 1969, prepared by Dr. Hartmann, contains the following pertinent information:

"Chief Complaint:  Right shoulder.
Duration:  Ten days.
Present Illness:  The patient had onset of right shoulder and arm pain some ten days ago. The patient was treated with injections into the shoulder without any improvement in symptoms. Subsequently, the patient's pain has radiated into the neck and down the arm to the radial aspect of the forearm. Symptoms are aggravated by use of the arm, and to some extent by head and neck motions, no headache. It is not affected by coughing. There have been no previous episodes.

Past Medical History:  The patient has had no broken bones. She has had an appendectomy, a hernia repair, and a vein ligation without any anesthetic complication. There has been no serious illness. The patient is allergic to Empirin and Codeine.

Systemic Review:  is not remarkable.

Family History:  is noncontributory.

Examination:  Shows a normal head and neck posture. Motion of the head on the neck is normal. There is tenderness over the right scalene muscle. The patient has good flexion and extension, lateral

bending is symmetrical. The right pulse is obliterated with elevation of the wrist to shoulder level and turning the head and neck in the opposite direction. Reflexes, sensation, and motor functions of the upper extremities are normal. There is tenderness over the greater tuberosity and right humerus. There is normal motion of the shoulder. The patient is obviously distressed and nervous.

Diagnosis:    Acute right scalene syndrome.

Treatment:    The patient admitted for further evaluation and treatment."

Dr. Ernest R. Hartmann, under date of May 13, 1969, reported to the compensation carrier as follows:

"The above named patient was re-examined by me on May 12, 1969.

We are enclosing the medical record on the above named patient. Since this patient was hospitalized, she failed to respond to conservative treatment and following the myelogram, which revealed a cervical disc, an anterior cervical spine fusion was done. The patient had good early improvement of her symptoms.

The patient on return for follow-up visit, records a history of injury while working for Pace Corporation. The injury was sustained somewhere between March 1 and March 15, 1969, when five or six boxes, weighing three or four pounds fell on her head. The weight fell about two feet before striking her head and back. The patient states following this injury she had headaches and had a knot on the back of her head for about three weeks. Two days after the accident her job was changed. At the time of the initial history, the patient states she did not recall the injury to her neck.

Examination shows the patient is considerably improved in ways of nervousness and distress. The

wounds are well healed and the sutures were removed.

The patient is to continue her collar and return in three weeks.

Further reports will be sent as the patient is seen."

Under date of June 4, 1969, Dr. Hartmann reported as follows:

"The above named patient was re-examined by me on June 2, 1969.

The patient's neck is considerably improved.

X-rays of the cervical spine show the anterior spine fusion of C-5, C-6, and C-7, the pegs are nicely in place.

The patient may leave off her collar at night, but continue to wear it in the daytime. She is to return in three weeks for further evaluation.

Further reports will be sent as the patient is seen."

On June 25, 1969, Dr. Hartmann reported as follows:

"The above named patient was re-examined by me on June 23, 1969.

The patient states she does all right as long as she has her brace on. She has some difficulty sleeping at night. She feels this may be due to the brace. The patient has some catching in her hip at the donnor sight with going up steps.

X-rays show a reversal of the cervical curve. The bone pegs are in place, but cannot evaluate the bone texture at this time.

The patient's neck was not examined today because of the time factor since surgery.

The patient is to continue use of the collar during the day and remove it for sleeping. The patient is to return in two to three weeks.

Further reports will be sent as the patient is seen."

On August 19, 1969, Dr. Rushton, Mrs. Burns' original family physician, reported to her attorney as follows:

"I examined the above today at which time she stated she was injured in March of this year while an employee of Pace Corporation Company of Camden, Arkansas. She stated that some boxes fell and hit her on the top of the head and on April 10 her right arm became numb. At that time she was treated by a doctor in Camden and wasn't getting any better. She later was treated by Dr. Meek in Camden and hospitalized on April 14.

Treatment in the Camden hospital lasted approximately one week and she was removed to Warner Brown Hospital in El Dorado at which time she was placed under the care of Dr. Hartmann. He did surgery in the cervical area, removing two discs and at the same time did a fusion of the cervical vertebrae.

She came here complaining of blackout spells and she had two yesterday. I checked her over and found her in a weakened condition, suffering from malnutrition. She stated to me that she had lost her appetite following surgery and had not regained it. Upon further examination she was found to have difficulty in her balance and coordination, which could possibly be due to the accident which she sustained.

She wears a cervical collar at times and does not have free movement in the cervical area. I think it is a little too soon following this type of surgery to give an estimate as to her permanent total disability."

There is substantial evidence in this case that Mrs. Burns received a rather severe blow to the back of her head when some boxes fell on her sometime in the first two weeks in March, 1969. There is substantial evidence that Mrs. Burns experienced severe pain in her arm on the morning of April 9 or April 10, 1969, and that this pain was traced to two discs in her cervical spine. There is substantial evidence that it was necessary to surgically remove the offending discs and to fuse the cervical vertabrae in the area.

Mrs. Burns testified that she had constant and severe headaches from the date the box struck her head until the date of surgery, and that she had not experienced headaches prior to her injury. This testimony is refuted to some extent by Mrs. Crawford who testified that Mrs. Burns came to her office quite often for aspirin for sinus headaches. The substantial nature of Mrs. Burns' testimony as to the unusual onset, duration and severity of her headaches is diminished by the apparent fact that she failed to mention it to any of the doctors who saw and treated her, and the record indicates that she herself failed to associate her headaches with the injury. She apparently had forgotten all about the boxes falling on her until she was quizzed by Dr. Hartmann about automobile or other accidents, and by her own admission this did not occur until after her surgery. On a follow-up examination report dated May 12, 1969, Dr. Hartmann states:

"The patient on return for follow-up visit, records a history of injury while working for Pace Corporation. The injury was sustained somewhere between March 1 and March 15, 1969, when five or six boxes, weighing three or four pounds fell on her head. The weight fell about two feet before striking her head and back. The patient states following this injury she had headaches and had a knot on the back of her head for about three weeks. Two days after the accident her job was changed. *At the time of the initial history, the patient states she did not recall the injury to her neck."* (Emphasis supplied).

Apparently Dr. Hartmann asked Mrs. Burns about headaches for under date of April 20, 1969, in setting out her complaints, he says "no headache."

It is obvious from the record and from Mrs. Burns' own testimony, that after she was questioned following her operation about any possible accident that could have injured her cervical spine, she simply related the known condition back to the last known accident that she felt could have accounted for the condition. Even though she testified that this period was bridged by headaches, there is no *evidence in the record* that headache is a symptom of cervical disc injury. The Commission, of course, has had considerable experience with ruptured disc cases and it is not difficult to associate ruptured cervical discs with trauma such as Mrs. Burns experienced, especially if followed by other known symptoms and an absence of any other known precipitating causes. In the case at bar, however, the necessary elements to a logical conclusion as to condition as well as causation are absent from the evidence of record in this case, and it is in such cases as this, where medical evidence becomes important in rounding out substantial evidence as to causation.

As already stated, none of the doctors who saw or treated Mrs. Burns testified by deposition or otherwise in this case. All of the medical evidence is in the form of hospital records and medical reports, and Dr. Hartmann, who performed the surgery, simply says in very general terms: "Since this patient was hospitalized, she failed to respond to conservative treatment and following the myelogram, *which revealed a cervical disc,* an anterior cervical spine fusion was done." (Emphasis added). Dr. Hartmann does not describe the discs or the bone structure at the disc spaces. He does not say whether the discs were protruding, herniated or ruptured, and he gives no clue as to whether such lesions as he must have found, were caused by chronic disease or by old or recent traumatic injury. He doesn't even say whether the discs were surgically removed. He does indicate that Mrs. Burns denied headaches, but he does

not say whether headache is a symptom of such disc lesion he found.

Dr. Rushton does say that Dr. Hartmann removed two cervical discs and at the same time did a fusion of the cervical vertabrae. He also says that Mrs. Burns has been experiencing blackouts "which could possibly be due to the accident which she sustained," but he sheds no light on whether the blackouts are related to the disc operation or whether the disc operation was related to the injury.

There is substantial evidence that the bursitis like pain suffered by Mrs. Burns on the morning of April 9th or 10th was related to the disc condition. But whatever the disc condition may have been, as found by Dr. Hartmann, the unanswered question still remains as to why Mrs. Burns did not suffer severe bursitis like pain in her arm as well, or instead of headache, immediately following the injury, if the disc condition was caused by the injury in early March. Perhaps medical testimony, especially from Dr. Hartmann who performed the surgery, could answer this question to the satisfaction of the substantial evidence rule, but without such answer the substantial evidence rule in many compensation cases could easily yield to the accident of choice.

We have not overlooked our prior decisions cited by both parties in this case. But questions of causation in compensation cases must be answered in the light of the facts peculiar to each case and the answer in one is of little aid to an answer in another. We have never attempted to lay down a rule for all cases as to when medical evidence is and is not necessary in establishing causal relation between an accidental injury and a disease or condition. As the record now stands in the case at bar, we are of the opinion that there is no substantial evidence connecting Mrs. Burns' disc condition and surgery with the accident in which she was struck on the head by falling boxes. The record is clear that Mrs. Burns' attorney followed the procedure which is prevalent among claimant attorneys to use medical reports in evidence by stipulation rather than the more expensive

method of eliciting medical evidence from the witness stand or by deposition. There is no question that Mrs. Burns is severely disabled and we conclude that she should not be denied the opportunity of eliciting further medical evidence as to possible proof of causation in this case.

The judgment of the circuit court is reversed and this cause is remanded with directions to remand to the Workmen's Compensation Commission for further proceedings not inconsistent with this opinion.

Reversed and remanded.

FOGLEMAN, J., concurs in the reversal but dissents from the remand.

BYRD, J., dissents.